Opinion issued May 27, 2010

 



 

 

 

 

 

 

                                                            

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00410-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



QUINTON LAMONT GILES, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 178th District Court

Harris County, Texas

Trial Court Cause No. 1164045

 

 



MEMORANDUM OPINION

 

A jury convicted appellant Quinton Lamont Giles of
murder.  After finding true the
enhancement that alleged a prior conviction for aggravated assault, the jury assessed
punishment at imprisonment for 60 years. 
See Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003).  Giles raises four issues on appeal.[1]  First, he contends that the trial court erred
by allowing the complainant’s father to testify despite his having watched the
trial after the parties invoked “the Rule.” 
Second, Giles challenges the factual sufficiency of the evidence to
support his conviction.  In his final two
points, Giles asserts the trial court erroneously admitted into evidence
cocaine found in his pocket, complaining of the alleged illegality of the
search and relevance.

          We modify the trial
court’s judgment and affirm as modified.

Background

Complainant Tommy Lee Harris owned a clothing store
called “The Throwback Kings,” which sold urban clothing and vintage sports
jerseys.  Harris employed Brian Alexander
(also called “Brownie Boy”), Richard Dean (also called “Pump Head” or “Head”),
Darius Celestine (also called “Smurf”), and Giles.  Dominique Turner (also called “Ghost” or
“Alabama”) was an old friend of Harris who sometimes shopped at the store.  At trial, Giles testified that The Throwback
Kings store was essentially a front for illegal drug sales, that he bought
cocaine and crack cocaine from Harris, and that he “cooked crack” and sold
illegal drugs for him.  But Dean,
Celestine, and Turner, all of whom had known Harris for many years, testified
that Harris did not sell drugs or that that they were not involved in drug
trafficking with Harris.  Alexander
testified that he did not know if Harris sold illegal drugs.  Alexander, Dean, and Giles all testified that
Harris was known to carry a loaded .40-caliber gun wherever he went and that
Harris had a concealed weapons license.

Several fact witnesses had criminal histories.  Dean testified that he had prior convictions
for burglary, delivery of illegal drugs, family violence, and attempted
burglary.  At the time of trial, Turner
was serving a federal prison sentence for conspiracy and intent to deliver a
controlled substance, and Celestine was serving a state-jail sentence for
manufacture and delivery of cocaine. 
Celestine admitted two prior convictions for possession of a controlled
substance.  Alexander had prior
convictions for both possession and delivery of controlled substances.  Giles testified that he had a prior felony
conviction for which he spent five years in prison.[2]

The Throwback Kings was burglarized twice in the
weeks before the shooting.  Giles
testified that one burglary resulted in the loss of illegal drugs and that
Harris had implied that Giles was responsible for the losses.

On August 21, 2005, Alexander, Dean, and Harris went
to a gun show.  Dean testified that
Harris left his .40-caliber gun in the truck. 
At the gun show, Harris bought a Kel-Tec 9-mm semiautomatic gun (“Baby
Nine”) and bullets.  Dean loaded the gun
at Harris’s request.  After the gun show,
they went to a townhouse where they met Celestine, Turner, and Giles.  Dean testified that Celestine let them into
the townhouse because the burglar bars were locked and Harris did not have a
key. 

Giles testified that he was at his aunt’s house in
Fort Bend County on the morning of August 21, 2005.  He testified that he went to the townhouse in
the mid-afternoon after Harris and Celestine called him numerous times.  He knew the townhouse because he went there
daily to cook crack cocaine for Harris. 
Giles testified that Celestine was there when he arrived, and Turner
arrived later to buy drugs and hang out. 
Giles became suspicious when he overheard a telephone conversation
between Turner and Harris in which Turner confirmed that Giles had arrived.

According to Celestine, that afternoon he and Giles
smoked marijuana which had been enhanced with embalming fluid, known as “hydro”
or “wet.”  Giles agreed that he smoked
marijuana with Celestine, but he denied that it was “wet” or “hydro.”  Giles also admitted that he had cocaine in
his pocket that afternoon.  Celestine
said that he sold marijuana to Turner that day and that Turner’s presence made
Giles agitated and suspicious.  Turner
testified that he used only codeine syrup that day. 

Celestine testified that they were listening to
music and hanging out.  He recounted that
Giles became upset and began crying after talking to his girlfriend on the
telephone.  According to Celestine,
Giles’s foot was resting on a gun that Harris had previously left at the
townhouse.  This was not the .40-caliber gun that
Harris was known to carry.  To prevent the gun from inadvertently firing,
Celestine moved it, hiding it under the couch.

What happened after Harris, Dean, and Alexander
arrived at the townhouse was disputed at trial. 
Dean, Celestine, Alexander, and Turner all testified that Harris was
showing off his new gun and passing it around while the men stood near or in
the kitchen.  According to each of those
four witnesses, Harris asked Giles to return the gun, and in response, without
provocation, Giles began to shoot Harris with it.  The same witnesses testified that Giles
continued firing until no bullets remained in the gun.  In addition to hitting Harris, Giles’s
gunfire also hit Dean and Celestine. 
Celestine grabbed the gun he had previously hidden under the couch and
shot back at Giles.  Dean, Celestine,
Alexander, and Turner testified that they were trapped inside the townhouse because
the front burglar bars were locked and that they eventually found the keys and
left through the back, carrying Harris with them.  Celestine testified that he hid in a closet
and called 9-1-1.  When they left, Dean,
Celestine, Turner, and Harris got into a maroon Ford Expedition and drove a few
hundred feet before meeting the ambulance which had just arrived.  The ambulance took Harris to the hospital,
and he died approximately two days later.

In contrast, Giles testified that Harris had told
him that he would have to transport drugs to Alabama to compensate for the
burglary losses.  According to Giles,
when he refused, Harris pulled out his .40-caliber gun and shot him first.  He then grabbed the new gun from Turner and
returned fire.  Giles said that he was
shot three or four times and that he called 9-1-1.  He took his knife and left the townhouse
after the others had left.

Houston Police Officer S. Grant responded to the
shooting.  When he arrived, he saw Giles
waving a knife and holding what appeared to be a marijuana cigar in the
other.  Officer Grant testified that
Giles was bleeding and appeared fidgety and intoxicated.  Giles told Officer Grant that Harris shot
him.  Initially, Giles was not combative,
but after the ambulance arrived, he became angry, combative, uncooperative, and
violent.  Officer Grant testified that
Giles appeared to be in pain.  

Officer S. Delacruz also responded to the
shooting.  When he arrived, he saw Giles
waving a knife and Grant holding him at gunpoint.  Delacruz handcuffed Giles and conducted a
pat-down search.  When the ambulance
arrived, he uncuffed Giles in order to secure him to the backboard.  Before he put Giles on the stretcher,
Delacruz did another pat-down search, “a general cursory search to make sure no
other gun or no other knife was found.” 
After Giles was secured to the stretcher with handcuffs and tape,
Delacruz searched Giles’s pockets, where he found a plastic bag containing a substance that field-tested positive
for cocaine.  Delacruz rode to the hospital in the
ambulance because Giles “was very combative, and the paramedics were scared,
were in fear of their life.”

Houston Police Officer D. Shorten investigated the
shooting.  After Giles’s mother called
her, Shorten spoke with Giles by telephone. 
According to Shorten, he told her that he had been to prison for five
years, that he worked for Harris, and that he had smoked marijuana the day of
the shooting.  Giles also told her that
Harris had been dealing drugs from his store, but Giles tried to minimize his
role in that.  Shorten testified that
Giles told her Harris was showing off his new gun and someone passed it to
Giles.  She testified that Giles
confessed to shooting Harris.  She later
testified, based on her notes, that Giles told her Harris had reached for his
gun and that Giles shot Harris and the others before they could shoot him.

Retired Houston Police Officer J. Kay testified
about the crime scene investigation.  Kay
testified that 15 spent shell casings were recovered at the scene along with a
Kel-Tec 9-mm semiautomatic gun.  He said
that the Kel-Tec gun could hold only ten bullets.  The officers also found a Smith and Wesson
9-mm semiautomatic gun in the rear of the Expedition.  Forensics testing showed that five of the
recovered spent shell casings came from the Smith and Wesson .9-mm
semiautomatic gun found in the Expedition, and the remaining spent shell
casings came from the Kel-Tec .9-mm semiautomatic gun found at the townhouse.

Tommy Lee Harris, Sr., the complainant’s father, sat
through the entire trial.  After Giles
testified that Harris used his .40-caliber gun to shoot Giles first, the State
proffered Harris, Sr. as a rebuttal witness. 
The trial court held a hearing outside the presence of the jury during
which the prosecutor argued that he first learned of Harris’s habit of carrying
a gun during the previous day’s testimony. 
The prosecutor also argued that he first learned that Harris, Sr. had
relevant information during that day’s lunch break.  The trial court permitted Harris, Sr. to
testify.  Harris, Sr. testified that he
picked up Harris’s car on the night of the shooting and found Harris’s
.40-caliber gun inside.  

The jury rejected Giles’s self-defense argument,
found him guilty of murder, and sentenced him to 60 years’ confinement.

“The Rule” of Sequestration of Witnesses

In his first issue, Giles argues that the trial court
erred by permitting Tommy Lee Harris, Sr., the complainant’s father, to testify
as a prosecution rebuttal witness when Harris, Sr. had observed the trial and
heard all the prior testimony.  Texas
Rule of Evidence 614 (“the Rule”) provides for the exclusion of witnesses from
the courtroom during trial.  Tex. R. Evid. 614 (“At the request of a
party the court shall order witnesses excluded so that they cannot hear the
testimony of other witnesses . . . .”).  “The purpose of placing witnesses under the
rule is to prevent the testimony of one witness from influencing the testimony
of another, consciously or not.”  Russell v. State, 155 S.W.3d 176, 179
(Tex. Crim. App. 2005); Mitchell v. State,
238 S.W.3d 405, 412 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d).  We review the trial court’s decision to
permit the testimony of a witness who has violated “the Rule” for abuse of
discretion.  Bell v. State, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996).  

In reviewing the trial court’s decision to allow the
testimony, we determine whether the defendant was harmed or prejudiced by the
violation by considering two criteria: (1) whether the witness actually
conferred with or heard testimony of other witnesses and (2) whether the witness’s
testimony contradicted the testimony of a witness from the opposing side or
corroborated testimony of a witness he had conferred with or heard.  Id.;
Martinez v. State, 186 S.W.3d 59, 65
(Tex. App.—Houston [1st Dist.] 2005, pet. ref’d).  

Violations of “the rule” fall into two
main categories: witnesses who have been sworn or listed as witnesses in the
case and either hear testimony or discuss another’s testimony; and persons . .
.  who were not intended to be witnesses
and are not connected with the case in chief but who have, due to events during
trial, become necessary witnesses.

Green v. State, 682 S.W.2d 271, 294 (Tex. Crim.
App. 1984).  If the witness was one who
had no connection with either the State’s case-in-chief or the defendant’s
case-in-chief and who, because of a lack of personal knowledge regarding the
offense, was not likely to be called as a witness, no abuse of discretion can
be shown.  Guerra v. State, 771 S.W.2d 453, 476 (Tex. Crim. App. 1988).  Thus, in reviewing a trial court’s decision
to “allow an otherwise disqualified witness to testify . . . [we] will
determine whether the witness was (1) connected to the State or defense
case-in-chief, and (2) whether the witness had any personal knowledge regarding
the offense.”  Webb v. State, 766 S.W.2d 236, 240 n.2 (Tex. Crim. App. 1989).  

Here, Harris, Sr. listened to the testimony of other
witnesses, including those who testified that Harris ordinarily carried a
.40-caliber gun and Giles’s testimony that Harris shot him first.  In addition, Harris, Sr.’s testimony was
consistent with the testimony that Harris left his gun in the truck on the day
of the shooting.  However, Harris, Sr.
was not connected with the State’s case-in-chief, and he had no personal knowledge
regarding the shooting.  Harris, Sr. was
not a witness to the shooting.  He was
not able to testify as to how or when the .40-caliber gun got into Harris’s
truck.  The prosecutor stated that
Harris, Sr.’s testimony became necessary during the trial, when the prosecutor
learned for the first time that Harris customarily carried a .40-caliber
gun.  Accordingly, because Harris, Sr.
was not connected to the State’s case-in-chief, had no personal knowledge of
the shooting, and was not an intended witness, we hold that the trial court did
not abuse its discretion by allowing Harris, Sr.’s testimony.  

We
overrule Giles’s first issue.

Factual Sufficiency 

In
his second issue, Giles contends that the evidence was factually insufficient
to support the jury’s rejection of his self-defense claim.  In a factual sufficiency review, we view all
of the evidence in a neutral light.  Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim.
App. 1999).  We will set the verdict
aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000); see Zuliani v. State, 97
S.W.3d 589, 595 (Tex. Crim. App. 2003) (applying factual sufficiency standard
of review to case when appellant challenged factual sufficiency of jury’s
rejection of his self-defense claim).

Under
the first prong of Johnson, we cannot
conclude that a conviction is “clearly wrong” or “manifestly unjust” simply
because, on the quantum of evidence admitted, we would have voted to acquit had
we been on the jury.  Watson v. State, 204 S.W.3d 404, 417
(Tex. Crim. App. 2006).  Under the second
prong of Johnson, we cannot declare
that a conflict in the evidence justifies a new trial simply because we
disagree with the jury’s resolution of that conflict.  Id.
Before finding that evidence is factually insufficient to support a verdict
under the second prong of Johnson, we
must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Id.  In conducting a factual sufficiency review, we
must also discuss the evidence that, according to the appellant, most
undermines the jury’s verdict. See Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

In
reviewing the factual sufficiency of the evidence, appellate courts should
afford almost complete deference to a jury’s decision when that decision is
based upon an evaluation of credibility.  Lancon
v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).  The jury is in the best position to judge the
credibility of a witness because it is present to hear the testimony, as opposed
to an appellate court which relies on the cold record.  Id.  The jury may choose to believe some testimony
and disbelieve other testimony.  Id. at 707.

As
alleged in the indictment, the State charged Giles with the murder of Harris by
shooting him with a deadly weapon, namely, a firearm.  See
Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003).  Four eyewitnesses testified that they saw
Giles shoot Harris at point-blank range without provocation.  These same witnesses testified that Giles used
Harris’s 9-mm Kel-Tec gun and fired until he had emptied it of bullets.  Retired police officer Kay testified that the
Kel-Tec gun held ten bullets and that they found an empty 9-mm Kel-Tec gun and
ten spent shell casings matching the gun at the shooting scene.  Officer Shorten testified that Giles told her
he shot Harris before Harris or the others could shoot him.  Dean testified that Harris left his
.40-caliber gun in the truck; Alexander testified that Harris did not remove or
fire his .40-caliber gun on the day of the shooting.

Giles
argues that the jury improperly rejected his self-defense claim.  Giles contends that the evidence established
that Harris was a drug dealer. 
Specifically, Giles points to evidence that Harris’s long-time friends
all had drug convictions, that he paid his employees in cash, that he owned
several cars, and that he customarily carried a gun.  Giles also contends that he was asked by Harris
to meet him at the townhouse, and that Harris locked the burglar bars and
passed around a loaded 9-mm gun, all of which reasonably placed Giles in fear
for his life.  He also relies on his own
statements to police when they arrived at the shooting scene, stating that “Tommy
Lee Harris shot me.”  

Giles
correctly notes that some circumstantial evidence was not disputed: Harris’s
friends admitted to prior drug convictions, Harris ordinarily paid his
employees in cash, Harris owned several cars, and Harris usually carried a
gun.  However, either alone or taken as
whole, these facts do not establish that Giles acted in self-defense.  The four eyewitnesses did not corroborate
Giles’s accusations that Harris was a drug dealer.  Rather, they testified that Harris did not
deal or sell illegal drugs.  In addition,
Dean testified that Harris did not have a key to the burglar bars.  Giles’s claim of self-defense relies almost
entirely on his own testimony and prior statements.  Thus, the jury’s decision was necessarily
based on its evaluation of the credibility of the witnesses.  As such we must afford its determination due
deference.  Lancon, 253 S.W.3d at 705.  

This
is not a situation in which the testimony of a “Cretan Liar” was opposed by
that of twelve Boy Scouts.  See Goodman v. State, 66 S.W.3d 283,
285–87 (Tex. Crim. App. 2001).  All of
the eyewitnesses to the shooting, including Giles, had prior felony and/or
illegal drug convictions.  Having viewed
the evidence in a neutral light, we conclude that the evidence is neither so
weak that the verdict is clearly wrong and manifestly unjust nor against the
great weight and preponderance of the evidence.  See Johnson
v. State, 23 S.W.3d at 11; Zuliani,
97 S.W.3d at 595.

We
hold that the evidence was factually sufficient, and we overrule Giles’s second
issue.

Admission
of Cocaine—Motion to Suppress

          In his third issue, Giles
challenges the trial court’s admission of the cocaine found in his pocket as a
violation of his constitutional right against unreasonable searches and
seizures.  Although Giles has framed the
issue as one involving his rights under both the Fourth Amendment of the United
States Constitution and article I, section 9 of the Texas Constitution, we need
not address the state constitutional claims because Giles has proffered no
argument or authority concerning the protection provided by the Texas
Constitution or how that protection differs from the protection provided by the
United States Constitution. Heitman v.
State, 815 S.W.2d 681, 690–91 n.23 (Tex. Crim. App. 1991); Montalvo v. State, No. 01-09-01134-CR,
2010 WL 1729414, at *3 n.3 (Tex. App.—Houston [1st Dist.] Apr. 29, 2010, no
pet. h.).

The trial court held a pretrial hearing on Giles’s
motion to suppress certain statements and evidence, including the cocaine found
in his pocket.  Officer Delacruz
testified that he handcuffed Giles and conducted a pat-down search when he
arrived at the shooting scene because Giles was waving a knife and behaving
incoherently and erratically.  Delacruz
testified that Giles initially refused to drop his weapon and was threatening
the police officers.  He further testified
that he conducted a second pat-down search when the ambulance arrived:

Q.      At some point was Mr. Giles loaded onto a stretcher on an
ambulance?

          

A.      That’s correct.

          

Q.      And what, if you remember,
was his demeanor at that time?

          

A.      He was extremely combative, would not basically obey any verbal
commands we gave him.  He’s trying to
bite us, kicking us.  I mean, he was—the
behavior that he displayed that day was not normal behavior.  I mean, it appeared he was intoxicated or
possibly on some kind of drugs.

          

Q.      And when he was put on the stretcher, did they have to—was he
restrained?

          

A.      Yeah, yes.  Me and
Officer Grant had to restrain him on the stretcher with paramedics, as
well.  And he talked about how he sold
drugs, something about how he was going to kill me, even kill other people when
he got out of jail.  He just—it was a
bunch of stuff he stated at the scene. 

          

Q.      Would you say that some of it was probably just, it was just
incoherent rambling?

          

A.      No.  I mean, there was
time when he would display, you know, very violent and aggressive behavior, and
then he would go back into just bragging about his previous criminal life.

          

Q.      Okay.  And did you feel to yourself that he was
still a threat?

          

A.      At that point, yes, sir, I
did.

          

Q.      And what did you do while he was being loaded onto the
ambulance?

          

A.      I went in and checked him again a second time to make sure
because he said, you know, he was going to kill me and kill the paramedics on
the way to hospital.  So I went ahead and
patted him down.  I felt some bulkiness
in his pockets, so I took it out and it was a clear plastic bag with cocaine.

 

          Giles objected on grounds
of violation of state and federal constitutional protections against
unreasonable searches.  In denying
Giles’s motion to suppress the cocaine, the trial court stated:

The motion to suppress the cocaine is . . . denied as to that that was
found in the pocket.  I remember the
officer’s testimony differently, that the officer said something about there
being a bulge in the pocket and he went to check and see what that was and
found the cocaine.

 

But just because it’s a search, discovery is not illegal.  I’m not telling you that it’s admissible at
this point.  I just don’t think at
whatever time it’s attempted to be admitted will pretty much cover—deal with
the extraneous issue and the relevance issue.

 

Standard of
Review

In reviewing a trial court’s ruling on a motion to
suppress evidence, we apply a bifurcated standard of review.  Carmouche
v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  We give almost total deference to the trial
court’s determinations on all fact questions and on application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor.  Johnson
v. State, 68 S.W.3d 644, 652 (Tex. Crim. App. 2002).  On all other application-of-law-to-fact
questions, we apply a de novo standard of review.  Id.
at 652–53.  We view the record and all
reasonable inferences from the record in the light most favorable to the trial
court’s ruling and sustain the ruling if it is reasonably supported by the
record and is correct under any theory of law applicable to the case.  Villarreal
v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

Investigative
Detention

A law-enforcement officer may stop and briefly
detain a person suspected of criminal activity on less information than is
constitutionally required for probable cause to arrest.  Terry v.
Ohio, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); Carmouche, 10 S.W.3d at 328.  In order to stop or briefly detain an
individual, an officer must be able to articulate something more than an
“inchoate and unparticularized suspicion or ‘hunch.’”  Terry,
392 U.S. at 27, 88 S. Ct. at 1883.  Instead, an officer must have “reasonable
suspicion” that an individual is violating the law.  Ford v.
State, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).  Reasonable suspicion exists when the officer
has some minimal level of objective justification for making the stop, i.e.,
when the officer can “point to specific and articulable facts which, taken
together with rational inferences from those facts, reasonably warrant [the]
intrusion.”  Terry, 392 U.S. at 21, 88 S. Ct. at 1880; see also Alabama v. White, 496 U.S. 325, 329–30, 110 S. Ct. 2412,
2416 (1990).  We disregard the subjective
belief of the officer in our reasonable suspicion analysis and consider the
totality of the circumstances objectively.  Ford,
158 S.W.3d at 492–93.

A valid investigative detention
can confer upon an officer the authority to pat down the suspect for weapons.  Under the “plain feel” doctrine, an officer
conducting a pat-down may seize an object “whose contour or mass makes its
identity immediately apparent” as contraband.  But when the conditions of the “plain feel”
doctrine (or the “plain view” doctrine) are not present, an officer conducting
a valid investigative detention must have probable cause in order to conduct a
search for non-weapon contraband or other evidence. . . .  Consequently, the officer’s conduct of
reaching into appellant’s pocket—even under a valid investigative detention—was
an illegal search unless there existed some exception to the usual probable
cause requirement.

 

Baldwin v. State, 278
S.W.3d 367, 371–72 (Tex. Crim. App. 2009) (citations omitted).

          When Officers Grant and
Delacruz arrived at the townhouse, Giles was standing outside, waving a knife,
behaving erratically, holding a marijuana cigar, and threatening the police
officers.  The officers were responding
to a shooting call and did not at that time know who would be a suspect and who
a complainant.  However, based on Giles’s
behavior, the officers had reasonable suspicion sufficient to justify an
investigative detention and a pat-down search for their own protection.

          But Giles complains on appeal about
the second search, during which Delacruz reached into Giles’s pocket and pulled
out a bag containing cocaine.  At the
suppression hearing, Delacruz testified only that he felt “some bulkiness,” not
that it was immediately apparent that the bulkiness he felt was
contraband.  See Baldwin, 278 S.W.3d at 371–72. 
The prosecutor asked no follow-up questions to elicit testimony as to
what Delacruz believed the “bulkiness” to be based on his experience.  Thus, Delacruz’s removal of the bag of
cocaine would not be justified under the plain-feel doctrine, given the
testimony in this case.  Compare Minnesota v. Dickerson, 508 U.S. 366, 377–78, 113 S.
Ct. 2130, 2138 (1993) (holding search of defendant’s pocket constitutionally
invalid when officer’s testimony “belie[d] any notion that he ‘immediately’
recognized the lump as crack cocaine”), with
Carmouche, 10 S.W.3d at 330–31 (holding search of appellant’s pocket
constitutionally permissible when officer testified he immediately recognized
lump in pocket as money), and Strickland v. State, 923 S.W.2d 617, 621–22 (Tex. App.—Houston [1st Dist.] 1995, no pet.)
(holding search of appellant’s pocket constitutionally permissible when officer
testified he recognized object in defendant’s pocket to be crack pipe before
removing it).  

However, the State justifies this second search as a
search incident to arrest, not as an investigative detention.  The State argues that Giles committed several
offenses while Grant and Delacruz looked on, including assault, terroristic
threat, and possession of marijuana.  See Tex.
Penal Code Ann. §§ 22.01(a)(2), 22.07(a)(2) (Vernon Supp. 2008); Tex. Health & Safety Code Ann. § 481.121(a)
(Vernon Supp. 2009).  The State contends
that because the officers had probable cause to arrest Giles, they were
entitled to conduct a search.

Search
Incident to Arrest

A search incident to arrest is an exception to the
Fourth Amendment’s warrant requirement.  McGee v. State, 105 S.W.3d 609, 615
(Tex. Crim. App. 2003).  However, for a
search to be considered “incident to arrest,” it must take place
contemporaneously with the defendant’s custodial arrest.  United States
v. Robinson, 414 U.S. 218, 225–27, 94 S. Ct. 467, 472–73 (1973); Williams v. State, 726 S.W.2d 99, 101
(Tex. Crim. App. 1986).  Giles was not
arrested contemporaneously with the second search.  He voluntarily surrendered to authorities in
Fort Bend County days or weeks after the shooting.  Thus, the search of Giles’s pocket was not a
valid search incident to arrest.

          Having concluded that the
search of Giles’s pocket was not justified under the plain-feel doctrine nor as
a search incident to arrest, we hold that the trial court erred by denying
Giles’s motion to suppress.  

Harm
Analysis

Having held that the trial court erred, we must
conduct a harm analysis to determine whether the error calls for reversal of
the judgment.  Tex. R. App. P. 44.2.  We
review the harm resulting from a trial court’s erroneous denial of a motion to
suppress and subsequent admission of evidence obtained in violation of the Fourth
Amendment under the constitutional standard of Rule of Appellate
Procedure 44.2(a).  See Hernandez v. State, 60 S.W.3d 106,
108 (Tex. Crim. App. 2001).  The question
under that standard is whether the trial court’s denial of a motion to suppress
and subsequent admission of evidence was harmless beyond a reasonable doubt.  See
Williams v. State, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997).  In applying the “harmless error” test, our
primary question is whether there is a “reasonable possibility” that the error
might have contributed to the conviction.  Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Our harmless error analysis should not focus on the
propriety of the outcome of the trial; instead, we should calculate as much as
possible the probable impact on the jury in light of the existence of other
evidence.  Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).  We consider the source and nature of the
error, the extent that it was emphasized by the State, its probable collateral
implications, the weight a juror would probably place on the error, and whether
declaring it harmless would be likely to encourage the State to repeat it with
impunity.  Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire record
in a neutral, impartial, and even-handed manner, not “in the light most
favorable to the prosecution.”  Id. at 586.

Here, Officer Delacruz testified without objection
that he found a bag containing cocaine in Giles’s pocket.  Officers Grant and Delacruz both testified
that Giles appeared intoxicated or high. 
The State also introduced medical records including numerous references
to Giles’s cocaine use, which Giles does not challenge on appeal.  Several witnesses testified that they smoked
“wet” or enhanced marijuana with Giles that day, and Giles admitted having
smoked marijuana.

On direct examination, Giles testified that he
cooked crack cocaine for Harris.  On
cross-examination, Giles testified, without objection, that he had cocaine in
his pocket when he went to the townhouse on the day of the shooting.  In closing, Giles’s attorney emphasized the
criminal and illegal drug histories of the witnesses.  In its closing argument, the State twice briefly
mentioned the cocaine found in Giles’s pocket, but did not emphasize it.

In light of the abundant evidence regarding Giles’s
use of and involvement with illegal drugs (including cocaine), some of which
Giles himself proffered, we conclude that in deciding whether Giles committed
murder, the jury would place little to no weight on the erroneous admission of
the bag of cocaine.  We do not believe
that declaring this error harmless would encourage its repetition.

Accordingly, we conclude that there is no
“reasonable possibility” that the error might have contributed to Giles’s
conviction, and we hold the trial court’s erroneous denial of Giles’s motion to
suppress to be harmless.  See Mosley,
983 S.W.2d at 259.

Admission of Cocaine—Relevance and
Rule 403

In
his fourth issue, Giles contends that the trial court abused its discretion by
admitting the cocaine found in his pocket because it was irrelevant and the
probative value of the cocaine was substantially outweighed by the danger of
unfair prejudice.

We
review trial court rulings concerning admission or exclusion of evidence under
an abuse-of-discretion standard.  Sexton v. State, 93 S.W.3d 96, 99 (Tex. Crim.
App. 2002); Erdman v. State, 861
S.W.2d 890, 893 (Tex. Crim. App. 1993).  A
trial court abuses its discretion when it acts arbitrarily and unreasonably,
without reference to any guiding rules or principles.  Montgomery
v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

As
we have already noted, Officer Delacruz testified without objection that he
discovered a bag of cocaine in Giles’s pocket. 
Giles also testified without objection that he had cocaine in his pocket
when he went to the townhouse.  “‘It is
well established that the improper admission of evidence does not constitute
reversible error if the same facts are shown by other evidence which is not
challenged.’”  Leday v. State, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (quoting
Crocker v. State, 573 S.W.2d 190, 201
(Tex. Crim. App. 1978)).  Thus, “overruling
an objection to evidence will not result in reversal when other such evidence
was received without objection, either before or after the complained-of
ruling.  This rule applies whether the
other evidence was introduced by the defendant or the State.”  Leday,
983 S.W.2d at 718.  Here, the same facts
were shown by other evidence that was not challenged.

We
overrule Giles’s fourth issue. 

Reformation of the
Judgment

Finally,
we note that the trial court’s judgment does not accurately comport with the
record in that it does not reflect Giles’s plea of true to the enhancement
charged in the indictment or the jury’s finding of “true.”  “An appellate court has authority to reform a
judgment to include an affirmative finding to make the record speak the truth
when the matter has been called to its attention by any source.” French v. State, 830 S.W.2d 607, 609
(Tex. Crim. App. 1992) (citing Asberry v.
State, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref’d)); accord Nolan v. State, 39 S.W.3d 697,
698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (“An appellate court has the
power to correct and reform a trial judgment to make the record speak the truth
when it has the necessary data and information to do so.”); see also Tex. R. App. P. 43.2(b).  The record supports modification of the
judgment because the court reporter’s record reflects that Giles entered a plea
of true.  Accordingly, the trial court’s
judgment is modified to reflect that Giles pleaded true to the enhancement
alleged by the State and to reflect that the jury found the enhancement true.

Conclusion

 

          We modify the trial court’s judgment
to include the enhancement, and we affirm as modified.

 

 

 

                                                          Michael
Massengale

                                                          Justice

 

Panel consists of
Chief Justice Radack and Justices Bland and Massengale.

Do not publish.  Tex.
R. App. P. 47.2(b).











[1]        After his
attorney filed a brief in this case, Giles filed a pro se brief.  Because an appellant has no right to hybrid
representation, we consider only the issues raised in Giles’s counsel’s brief
and do not address the points raised in Giles’s pro se brief.  See
Rudd v. State, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981); Landers v. State, 550 S.W.2d 272, 280
(Tex. Crim. App. 1977).





[2]        Officer
D. Shorten testified that Harris had no criminal history.